

# In the
# Missouri Court of Appeals
## Western District

IN THE MATTER OF THE
APPLICATION OF SPIRE MISSOURI
INC TO CHANGE ITS
INFRASTRUCTURE SYSTEM
REPLACEMENT SURCHARGE IN ITS
SPIRE MISSOURI EAST SERVICE
TERRITORY; IN THE MATTER OF
THE APPLICATION OF SPIRE
MISSOURI INC TO CHANGE ITS
INFRASTRUCTURE SYSTEM
REPLACEMENT SURCHARGE IN ITS
WEST SERVICE TERRITORY;
MISSOURI PUBLIC SERVICE
COMMISSION,
Respondent,

v.

THE OFFICE OF PUBLIC COUNSEL,
Appellant;

SPIRE MISSOURI INC.,
Appellant.

WD82302
CONSOL. WITH:
WD82373

OPINION FILED:

NOVEMBER 19, 2019

Appeal from Public Service Commission

Before Division Two: Thomas H. Newton, Presiding Judge, Anthony Rex Gabbert, Judge,
Thomas N. Chapman, Judge

1

The Office of Public Counsel and Spire Missouri, Inc. appeal the Report and Order of the Public Service Commission of the State of Missouri. In three points on appeal, Spire Missouri, Inc. claims the Public Service Commission erred in disallowing $4,100,000 in Infrastructure System Replacement Surcharges. In one point on appeal, the Office of Public Counsel claims the Public Service Commission erred in allowing Spire to collect costs it incurred to replace cast iron and bare steel mains and service lines. The Commission's Report and Order is reversed and the case is remanded.

## Facts[1]

The Public Service Commission of the State of Missouri ("PSC") is a state administrative agency that regulates public utilities. §§ 386.040; 386.250.[2] Spire Missouri, Inc. ("Spire")[3] is an investor-owned gas utility providing retail gas service to large portions of Missouri through its two operating units or divisions, Spire Missouri East and Spire Missouri West. Spire is a "gas corporation" and a "public utility" as defined in section 386.020. The Office of Public Counsel ("OPC") may represent and protect the interests of the public in any proceeding before or appeal from the PSC.

On June 7, 2018, Spire filed an application and petitions with the PSC to change its Infrastructure System Replacement Surcharges ("ISRS") in its East and West service territories. Spire requested an adjustment to its ISRS rate schedules to recover costs incurred in connection with infrastructure system replacements made during the period that ran from October 1, 2017 through April 30, 2018, with pro forma ISRS costs updated through June 30, 2018. The PSC

---

[1] Much of the recitation of facts is taken directly from the PSC's Report and Order without further attribution.
[2] All statutory references are to RSMo 2016 unless otherwise indicated.
[3] In 2017, Spire stopped doing business under the name of Laclede Gas Co, and changed its name to Spire.

issued notice of the applications and provided an opportunity for interested persons to intervene. No intervention requests were submitted.

On August 6, 2018, the Staff of the PSC ("Staff") filed its reports proposing a number of corrections and adjustment's to Spire's calculations. Staff recommended that the PSC reject the original tariff sheets and approve ISRS adjustments for Spire based on Staff's determination of the appropriate amount of ISRS revenues. Staff later provided corrections and information for the updated months of May and June 2018.

On August 16, 2018, Spire filed a motion objecting to Staff's recommendations and requesting an evidentiary hearing. The OPC filed a motion to dismiss Spire's applications. The PSC held an evidentiary hearing on August 27, 2018.

The PSC found the following in its Report and Order: The last general rate cases applicable to Spire were decided by the PSC by order issued on March 17, 2018, with new rates effective April 19, 2018. As part of those general rate cases, Spire's existing ISRS were reset to zero. The ISRS filings at issue in this case are Spire's first ISRS filings since the last general rate case.

Sections 393.1009 through 393.1015 permit gas corporations to recover certain infrastructure system replacements costs outside of a formal rate case through a surcharge on its customers' bills. Historically, Spire has used a piecemeal approach to pipe replacement by replacing pipes when they were failing or about to fail. In 2010, Spire changed to what it contends is a more systematic and economical approach where it retires pipes in place and installs new plastic pipes often in a different location. The new location is more accessible and more efficient to maintain than the location of old pipes which were often under streets.

Spire's current neighborhood replacement program replaces or retires in place and no longer uses cast iron, steel, and plastic pipes. Most of the cast iron pipes being replaced are over

3

a hundred years old. Cast iron pipes are unsafe to use because they undergo a process called graphitization in which the iron leeches out making the pipe subject to cracking and leaking. The steel pipe being replaced is bare and not cathodically-protected so those pipes corrode relatively quickly and need to be replaced.

Some of the plastic pipes that Spire replaced or retired in place are not worn out or in a deteriorated condition. Spire did not conduct a review to determine if that plastic pipe was worn out or deteriorated before replacing it. The polyethylene plastic pipe that Spire uses should last indefinitely. Spire's work order authorization sheets did not explain if a main or service line being replaced was worn out or deteriorated. Spire did not provide sufficient information for Staff to determine whether any plastic pipe being replaced was incidental to and required to be replaced in conjunction with the replacement of other worn out or deteriorated components. Spire has not attempted to calculate the amount of plastic pipe replaced that was worn out or in a deteriorated condition. Some of Spire's blanket work order involved replacing or repairing plastic pipes that were not worn out or deteriorated.

In *Matter of Application of Laclede Gas Co. to Change Its Infrastructure Sys. Replacement Surcharge in Its Missouri Gas Energy Serv. Territory v. Office of Pub. Counsel*, 539 S.W.3d 835 (Mo. App. W.D. 2017) ("2016 ISRS Case"), this court reversed the PSC's order that the plastic pipe was an integral component of the worn out and deteriorated cast iron and steel pipe and that the cost could be recovered through an increase to the existing ISRS surcharges. Based on the opinion in the 2016 ISRS Case, Staff developed a methodology to remove the cost of the replacement of ineligible plastic mains and service lines from Spire's ISRS cost recovery.

The PSC found in its Report and Order that Staff witnesses provided credible testimony on the correct methodology for determining the cost of ineligible plastic pipe replacements and that

4

Staff's evidence on this issue was the best evidence presented at the hearing. Staff made appropriate adjustments to Spire's ISRS request based on the plastic pipe replaced and calculated a revised ISRS revenue requirements ("Adjusted ISRS"). The Adjusted ISRS recommended by Staff resulted in Spire collecting ISRS revenues in the amount of $2,607,610 for its East service territory and $5,411,793 for its West service territory.

These appeals by Spire and OPC follow. Spire seeks an additional $4,100,000 in ISRS revenues. OPC maintains the matter should be remanded with instructions to remove from the ISRS revenue awarded the cost incurred to replace cast iron and bare steel mains and service lines.

## Standard of Review

"The Commission's Order will be affirmed if it is lawful and reasonable." *Id*. at 837. "The Commission's Order is lawful if it is authorized by statute, and our review of this issue is *de novo*." *Id*. at 838. "The Commission's Order is reasonable if it is supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious; [and] where the [Commission] has not abused its discretion." *Id*. (internal quotation marks omitted). "The party appealing bears the burden of proving that the Commission's Order is unlawful or unreasonable." *Id*.

## Office of the Public Counsel – Point I

In its sole point on appeal, the OPC claims the PSC erred in authorizing Spire to collect the costs it incurred to replace cast iron and bare steel mains and service lines. It claims the decision was not supported by substantial and competent evidence and is subject to review under section 386.510. The OPC maintains that Spire failed to present sufficient evidence to prove that the cast iron and based steel mains and service lines were "worn out or [] in [a] deteriorated condition" as required under the definition of "Gas utility plant projects" found in section 393.1009(5)(a).

5

"Although single-issue ratemaking is generally prohibited, section 393.1012.1 authorizes a gas corporation to petition the Commission for an increase to its ISRS surcharge to recover the costs of certain government-mandated infrastructure replacement projects outside a general ratemaking case." *Laclede Gas Co.*, 539 S.W.3d at 838 (internal quotation marks omitted). "Pursuant to section 393.1009(3), 'eligible infrastructure system replacements' [under section 393.1012.1 include] 'gas utility plant projects' that meet certain specific criteria." *Id.* "Eligible 'gas utility plant projects' costs that may be recovered through an ISRS surcharge include: '(1) those costs associated with replacements; (2) those costs associated with improvements and enhancements that defer replacements; and (3) those costs associated with government-mandated relocations.'" *Id.* (citing §393.1009(5)). "Significant to this appeal, section 393.1009(5)(a) sets forth the ISRS-eligibility requirements for replacement projects." *Id.* "Under that provision, cost recovery through an ISRS surcharge is available for '[m]ains, valves, service lines, regulator stations, vaults, and other pipeline system components installed *to comply with state or federal safety requirements* as replacements for existing facilities that have *worn out* or are in *deteriorated condition*[.]'" *Id.* (quoting § 393.1009(5)(a) (emphasis added)).

"Section 393.1009(5)(a), *supra*, clearly sets forth two requirements for component replacements to be eligible for cost recovery under ISRS: (1) the replaced components must be installed to comply with state or federal safety requirements and (2) the existing facilities being replaced must be worn out or in a deteriorated condition." *Id.* "The definition of 'deteriorate' is 'to make inferior in quality or value,' 'to grow worse,' and 'become impaired in quality, state, or condition.'" *In Matter of Verified Application & Petition of Liberty Energy (Midstates) Corp.*, 464 S.W.3d 520, 525 (Mo. banc 2015) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 616 (1993)). "Clearly, this definition indicates that deterioration is a gradual

6

process that happens over a period of time rather than an immediate event." *Id*. (holding that utility plant projects which were damaged by a third party's negligence are not eligible for an ISRS surcharge because such damage is not from structures being worn out or deteriorated). "[O]ur Supreme Court has found this requirement to be mandatory and has interpreted it narrowly." *Laclede Gas Co.*, 539 S.W.3d at 839.

Essentially, the OPC argues in this appeal that the evidence presented was that old pipes can become worn out or deteriorated and that many of the pipes at issue were old. It argues that no evidence was presented that the pipes at issue actually were worn out or deteriorated. Thus, the OPC concludes the statutory requirements for ISRS have not been satisfied.

Craig Hoeferlin, Spire's Vice President of Operations Services, testified that blanket work orders[4] are designed to charge for routine situations where there is a leak or other problem with the facility that needs to be replaced. Instead of being a planned project, it is something Spire came across on something like a leak survey or a leak crawl. He testified that no review was conducted to determine if the plastic that was retired was worn out or deteriorated. Instead, "[a] review was done to determine what was the most efficient way to install the new system." Hoeferlin later testified blanket work orders are reviewed by engineering staff and accounting staff to make sure everything included would be covered by ISRS. He believed that all cast iron and all the steel was worn out and deteriorated. He stated that any time there is a leak in the structures that are bare steel and cast iron that by definition the structures are worn out and deteriorated.

Hoeferlin also testified that "most" of the cast iron being replaced is over a hundred years old. He described a process called graphitization where the iron has leached out so the cast iron is mainly carbon. That makes it so the cast iron can crack very easily and that leads to leaks. The

---

[4] Much of the testimony referenced blanket work orders. The evidence at the hearing was that a blanket work order covers a large number of minor miscellaneous ISRS eligible activity.

steel that Spire replaced was bare and unprotected and could corrode very easily. He testified that "unprotected steel does corrode relatively quickly, so that's why it needs to be replaced. Cast iron really doesn't corrode. It's a different type of corrosion. It's graphitization where the iron leaches out and then it becomes very brittle. So those two types of materials, for lack of a better term, do corrode, that's why they need to be replaced."

Glenn Buck, Spire's Director of Regulatory and Finance, testified that facilities included in the blanket work orders are worn out or deteriorated. He defined worn out or deteriorated: "For purposes of my answer that means it is no longer in the safe established condition to provide service." It includes situations where a fitting gets loose. He did not do the analysis to determine what was replaced specifically under the blanket works orders, however. He left that to the engineers. He stated that the steel and copper infrastructure that was replaced was "certainly probably worn out." Buck further testified:

> Q. And once again the service life or the useful life, that is on average how long we can expect these facilities to last before they wear out?
>
> A. Sure. And I think it is important to note that if you're going out there and you are replacing a system and you come across a plastic service that is 42 years old, but it doesn't have any leaks on it, I'm not sure you shouldn't at least consider removing that at that point because what better opportunity would you have than to be there when it's basically at the end of its service life.
>
> Q. And so you can use the useful service life as kind of a rule of thumb as opposed to try to dig down and reveal the pipe in say, Geez, is this worn out and deteriorated yet?
>
> A. Yes. Correct.

Kim Bolin, a Utility Regulatory Auditor with the PSC, testified that nothing was provided in Spire's work order authorization sheets that explained if a main or a service was worn out or deteriorated. She testified that Staff did not consider the age of a pipe when performing its

8

calculations. Spire never provided any testing regarding the steel and cast iron mains being replaced to show that they were worn out or deteriorated.

Some of the mains that were taken out had not reached their average service life. Steel and cast iron mains have a service life of 80 years. When examining various selected work orders provided by Spire, the oldest steel main being replaced was from 1950. It had not reached the end of its service life at the time it was depreciated in 2018. The oldest cast iron main being replaced in the selected work orders was from 1947. It also had not reached the end of its service life at the time it was retired in 2018.

Bolin testified that service life is an average and thus some items will last longer time periods or shorter time periods than the average. She stated that Staff does not agree that whether something is at or near its average useful life is a factor to take into account in determining whether the item is worn out or deteriorating. She acknowledged that tearing up the structures and visually inspecting them is not prudent because it would be costly.

John Robinett, a Utility Engineering Specialist with the OPC, testified that depreciation average service life can be an indicator for whether a pipe is worn out or deteriorated. He testified that problems arise when using the concept of physical condition as a measure of depreciation. Wear and tear accounts for a minority of property retirements. Robinett further testified:

> Q. Thank you. Moving back to the testimony of Mr. Buck, on Page 5 in reference to cast iron and steel pipes that are being replaced Mr. Buck says that no party in this case disputes if they are worn or in a deteriorated condition. Do you agree with this?
>
> A. I do not. I asked several [Data Requests] in this case trying to get about the worn out and deteriorated condition of the pipe.
>
> Q. So OPC is contesting that the pipes are worn out or deteriorated?
>
> A. I don't believe there is evidence in this case that would support the pipes were worn out and deteriorated.

9

Q. You just mentioned several [Data Request] responses that you sent to Spire. Did you receive a response?

A. I sent [Data Requests] and I did receive responses as well as probably an objection letter or two.

…

Q. What specifically did the Company have to say with regards to whether they were able to demonstrate the pipes were worn out or deteriorated?

A. The objection was that the request was overly broad and unduly burdensome because it seeks any and all documentation on all the piping replaced. Notwithstanding this objection Spire states that other than relocations, most of the replacements were performed as part of the Commission mandated replacement programs. This is precisely the type of work contemplated by the ISRS statute. We have long-held that pipes subject to these mandates are by definition worn out or in a deteriorated condition.

Q. Based on that you would say Spire is merely assuming the pipes are worn out and deteriorated?

A. I believe that from my understanding of what the objection is is that because there is a ISRS statute, the replacements are mandated and they believe that they fit the definition.

Q. In [Data Request] 8513, which is on the second page, you requested what information that Spire East or West -- what test information Spire used to perform on the pipes to determine if they were worn out or deteriorated. What was their response?

A. If it is economically or operational feasible to reconnect a service line to a main that is being installed in connection with the Company's cast iron and bare steel replacement programs, it will be reused. If it is not economically or operational feasible to reconnect the service line to a newly installed main a new service line will be installed. As the Company has repeatedly demonstrated such an approach does not result in any incremental increase in either the Company's ISRS cost or the resulting ISRS charges, but instead reduces them compared to the cost that would be incurred if an attempt was made to reuse service lines that cannot feasibly or -- feasibly be economically or operationally reconnected to the main. Any effort to perform tests on service lines cannot be economically or operationally reused would serve no purpose, but instead would be an unnecessary and imprudent expenditure of resources.

…

10

Q.  So is there any evidence in the record that shows the pipes that are being retired are actually worn out or deteriorated?

A.  I think the only evidence that is in the case is related to the -- I believe it's only alpha designations for each ISRS project that are attached to the verified applications.[5]

Robinett also examined various work orders provided by Spire.  The earliest steel mains in those orders being retired were from 1952 and 1962.  Those mains fall short of the average service life ordered for those accounts for Spire East.  Also included were cast iron mains from the 1950's and 1962 that similarly fell short of service life.  Other steel mains were from 1951 and 1967 while other cast iron mains were from 1956 and the 1960's.

Robinett agreed that average service life is an average and it would not be surprising to have some facilities retired either sooner or later than the average date.  He also agreed that salt causes corrosion.  He further testified:

---

[5] Spire attached to its petition a document listing each project claimed as ISRS eligible.  Each project was coded with the letters that represented the "state or federal safety requirement."  Many projects were coded with multiple letters while many others were simply coded as "na" and apparently were not done in compliance with a safety requirement.  Spire also identified which subsection of the ISRS statute was satisfied by the project.  The vast majority of projects identified by Spire as falling under section 393.1009(5)(a) were coded as "A,B,C,K."  Those letters were identified as:

A: Safe and Adequate Service - Replace, repair or remove unsafe pipeline segments

B: General Requirements for Maintenance - Replace, repair or remove unsafe pipeline segments

C: Replacement Programs - Replacement program requirements for certain pipelines

K: Gas Distribution Pipeline Integrity Management - Replace, repair or remove unsafe distribution pipeline segments

We note that Spire used other letters to represent facilities that were worn out of deteriorated:

D: Gas Leaks - Repair of system leaks through pipeline rehabilitation and replacements

E: Corrosion Control - Remedial action in response to graphitization and corrosion through pipeline rehabilitation and replacements

L: Telemetering Requirement - Replace Worn or Deteriorated Telemetry/SCADA Equipment

M: Requirements for Odorization of Gas - Replace Worn or Deteriorated Odorization Equipment

Q. Let's just put it on more modern facilities that are actually old. Is it Public Counsel's position that in its cast main replacement program that before the Company replaces cast iron main it should uncover it, dig it up, test it and see what its condition is before it replaces it?

A. It could. I don't believe that is the only way that they could prove that it was worn out or deteriorated.

Q. Well, let's look at it that way. Have you gone ahead and done any kind of analysis of what it would cost to uncover facilities, take a review of what they're doing and what condition they are in before you decide whether to replace it or not?

A. I have not.

Q. Okay. Just kind of ballparking it, do you think it would be pretty expensive?

A. I believe it could be, yes.

…

Q. Yeah. Would you expect a utility to undertake those kind of expensive testing procedures to determine the condition of [an] older asset that it already knows if I retire it and put a new facility in, it's going to save me money rather than trying to use it?

A. I believe there needs to be some proof that it is a worn out or deteriorated condition, whether that is leak analysis or something along those lines. Otherwise, I mean, it is recoverable under the general rate proceeding for a replacement.

The PSC found that cast iron pipes are unsafe to use because they are subject to cracking and leaking, and the steel pipe being replaced is bare and not cathodically-protected so those pipes corrode relatively quickly and need to be replaced. The PSC concluded that the cast iron and steel pipes were replaced to comply with state or federal safety requirements and were worn out or in a deteriorated condition, so they are eligible for recovery under ISRS. The PSC also found, however, that Spire's work order authorization sheets did not explain if a main or service line being replaced was worn out or deteriorated.

The evidence at the hearing was that Spire considered a structure to be worn out and deteriorated any time there was a leak. Missouri courts have found otherwise. *See Liberty Energy*,

12

464 S.W.3d at 525 (holding that costs for replacing lines damaged by a third party were not eligible for recovery under ISRS).

A review of the record reveals that Spire's primary argument revolved around the age of the facilities and the assumption that old facilities must be worn out or deteriorated. There was no evidence with respect to how long it takes cast iron and steel to become worn out or deteriorated. Moreover, the evidence suggested that the time for the deterioration to occur is different from location to location.

During discovery, the OPC asked Spire for "any and all documentation demonstrating the pipe being replaced is in a worn out or deteriorated condition." Spire responded with an objection which stated, in part, that "most of the replacements were performed as part of Commission mandated replacement programs. This is precisely the type of work contemplated by the ISRS Statute. We have long held that the pipes subject to these mandates are by definition worn out or in [a] deteriorated condition." Spire seems to believe that it does not need to present evidence that the pipes it replaces are worn out or deteriorated because it considers any pipe subject to a state or federal replacement requirement to be by definition worn out or deteriorated. Missouri courts have found otherwise. *Laclede Gas Co.*, 539 S.W.3d at 838 ("Section 393.1009(5)(a), *supra*, clearly sets forth two requirements for component replacements to be eligible for cost recovery under ISRS: (1) the replaced components must be installed to comply with state or federal safety requirements *and* (2) the existing facilities being replaced must be worn out or in a deteriorated condition." (emphasis added)).

Spire's other central argument was that it was cheaper, faster, and more efficient to replace all the facilities at the same time in a neighborhood by neighborhood approach.

> [W]e do not believe that section 393.1009(5)(a) allows ISRS eligibility to be bootstrapped to components that are not worn out or deteriorated simply because

that are interspersed within the same neighborhood system of such components being replaced or because a gas utility is using the need to replace worn out or deteriorated components as an opportunity to redesign a system (*i.e.*, by changing the depth of the components or system pressure) which necessitates the replacement of additional components.

*Id*. at 839 n.5 (rejecting an argument that ISRS-eligibility should be determined based on the condition of the entire neighborhood system because the "effort to assign ISRS eligibility to [] pipes that are not worn out or deteriorated by evaluating an entire neighborhood system as a singular unit finds no support in the plain language of section 393.1009(5)(a)").

While Spire's "replacement strategy may laudably produce a safer system, the question squarely before us is not whether its chosen approach is prudent but rather whether the replacement of … components that were not in a worn out or deteriorated condition are ISRS-eligible." *Id*. at 840. "In analyzing that proposition, we cannot ignore the plain language of the statute for convenience, expediency[,] or necessity to conclude that the costs are eligible for recovery through the ISRS process." *Id*. (internal quotation marks omitted).

The PSC's Report and Order is not supported by competent and substantial evidence and is thus unreasonable. The point is granted. Given our disposition of this point, we need not address Spire's points on appeal.

### Conclusion[6]

The Commission's Report and Order is reversed to the extent it allowed ISRS recovery for structures not shown to be worn out or deteriorated. The case is remanded for the sole purpose of removing the cost incurred to replace cast iron and bare steel mains and service lines not shown to be worn out or deteriorated from the ISRS revenue awarded to Spire. Ratepayers shall be refunded that amount by the most expeditious and authorized means available. Nothing in this opinion

---

[6] The PSC filed a motion to strike Spire's appendix to its reply brief and specified pages in its reply brief referring to a PSC order dated May 3, 2019. We deny that motion.

should be construed as expressing any view on the Commission's consideration of those costs in the context of a general ratemaking case.

 

 

_____
Anthony Rex Gabbert, Judge

All concur.